# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2452-20

D.L.,[1]

    Plaintiff-Appellant,

v.

J.A.,

    Defendant-Respondent.

_____

Submitted December 8, 2021 – Decided January 19, 2022

Before Judges Hoffman, Whipple and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-2172-21.

Kozyra & Hartz, LLC, attorneys for appellant (Stelios Stoupakis, on the brief).

Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials to identify the parties to protect the identity of the victim. See R. 1:38-3(c)(12).

Plaintiff D.L. appeals from an April 14, 2021 order dismissing a temporary restraining order (TRO) against defendant J.A. We reverse and remand in part.

Plaintiff and defendant had a dating relationship that started in 2010. They have two children together, M.A., who is ten years old, and M.L., who is eleven years old. On February 21, 2021, Bloomfield Police responded to a report of a dispute between plaintiff and defendant. Plaintiff had come to defendant's home to pick up her children for church. M.L. told plaintiff that she saw defendant drinking and was scared of his behavior. Defendant told the officers plaintiff argued with him and pushed him and that he asked her to leave, which she refused, prompting him to call 911. Then-nine-year-old M.A. told police that her mother came to pick them up for church and shoved her father. Plaintiff told one of the police officers that, as she was leaving with the children, defendant pushed her, and she thought defendant was trying to kill her. When the police officers questioned defendant, he told them that he left service as a police officer because "he does not have patience and would just shoot someone." Defendant admitted to thinking about killing or harming himself all the time. The officers did not find signs of alcohol consumption in the house.

A-2452-20

Eventually, defendant agreed to let the children go to church with their mother and he was voluntarily transported to the hospital for a mental health evaluation. There, he became more erratic and refused to calm down. Emergency room staff sedated him. While defendant was at the hospital, plaintiff went to police headquarters to obtain a TRO and file a complaint. She alleged that defendant "threaten[ed] to grab something out of the cabinet to kill her with." The court granted the TRO dated February 21, 2021. Plaintiff filed a complaint for simple assault, N.J.S.A. 2C:12-1(A)(1), and terroristic threats, N.J.S.A. 2C:12-3A. Defendant was served with the TRO and the complaint at the hospital.

On March 11, 2021, the court amended the TRO permitting defendant to have in-person, supervised parenting time with the children on two days. The following day, the court granted a second amended TRO, and on March 17, 2021, the court granted a third amended TRO that included an extensive prior history of domestic violence including the allegation that defendant once texted plaintiff "a picture of a bloody knife" with the text "bye[,] [D.L.,] tell the girls why."

Defendant's attorney served notices in lieu of subpoena dated March 29, 2021, on M.L. and M.A. Plaintiff moved to quash.

A-2452-20

On April 8, 2021, the police responded to defendant's request for a welfare check for the children. Defendant showed the police a text message from M.L. stating, "I'm really scared. I was going for a snack in the kitchen and now I'm scared for my life. [D.L.'s fiancé] grabbed my arm and threatened to kill me if I told the cops or the court anything." M.A. reported that nothing happened that day. The Division of Child Protection and Permanency was contacted. Later that day, D.L.'s fiancé showed the police text conversation between defendant and M.A., who wrote "when do I (sloth emoji)." Defendant responded, "Ask [M.L.]. She knows more. Maybe early [nighttime]." Plaintiff's fiancé opined that defendant persuaded M.L. to text him so that the police would get involved.

The Family Part conducted a final restraining order (FRO) hearing on April 9 and April 14, 2021. During the hearing on April 9, 2021, the court explained that it would first take testimony on the predicate offenses and then on the prior history if the plaintiff met her burden of proof. Neither party objected.

The court noted that the two predicate criminal offenses alleged were assault and terroristic threats and that the parties have had prior restraining orders. Plaintiff testified that, on February 21, 2021, M.A. and M.L. were at defendant's apartment for his parenting time. M.A. called plaintiff and asked to

be taken to church. As she was preparing to leave with their daughters, plaintiff and defendant argued, and defendant stated, "I'm going to kill you, I'm going to fucking kill you, I'm going to fucking kill you." Plaintiff believed those threats. Defendant previously told her that he had two guns, which she had never seen. Defendant then started to rummage through the cupboards. Plaintiff thought that he may have been searching for something to hurt her. Defendant pushed plaintiff hard on her chest. She was afraid and thought defendant appeared and smelled intoxicated. "He was slurring his words, he was laughing nonsensically, his moods were elevating, laughing inappropriately and then getting very angry." Defendant called the police and reported that plaintiff kidnapped the children and had a weapon. Plaintiff testified that defendant previously threatened her with a weapon two times, through text messages "several times," and altogether "hundreds" of times. The police seized no weapons on February 21, 2021.

The court permitted cross-examination on the prior restraining orders.

> [Plaintiff's counsel]: Your Honor, objection. Objection as to what the prior restraining orders had to do with the predicate act.
>
> [The court]: That's – that's – I'm going to allow the question, [b]ecause we're going to be getting into that potentially later. If he wants to ask it now that's fine.

5

A-2452-20

Additionally, plaintiff offered evidence of prior text messages between the parties. The court did not permit plaintiff to testify about the text messages.

Defendant moved to dismiss for failure to prove a prima facie case. The court noted that the parties had a twelve-year relationship, that there were previously "hundreds of threats – two prior threats with weapons," and that D.L. was more fearful because J.A. was "more intense." According reasonable inferences in favor of plaintiff, the court denied the motion.

Defendant sought to call M.A. as a witness. Plaintiff objected because she did not want to put M.A. in the middle of the dispute and because she felt that defendant influenced M.A. The court stated that the fact that a witness may have emotional or psychological issues does not bar the court from preventing a litigant from calling a witness. However, the court offered to accommodate either parent's requests "to protect the child from any harm, minimize any anxiety or trauma." The court noted that both children may have been eyewitnesses to the incident. The court also noted that the court must determine whether the child is a competent witness under N.J.R.E. 601. The court noted that M.A. is ten years old, and that the court knew "no other information about her."

A-2452-20

At the second hearing on April 14th, 2021, conducted via Zoom, the court explained that it needed to hold an N.J.R.E. 104(a) hearing to determine whether M.A. would be a competent witness. If the court determined M.A. was competent and able to testify, then the court would ask some, but not all, questions that the parties proposed.

The court questioned M.A. The court asked M.A. to explain the difference between right and wrong. The court proceeded to ask M.A. about the difference between telling the truth and lying. The court then asked M.A. whether she remembered anything about the events on February 21, 2021, and she answered affirmatively. When asked whether she "would ever lie for [her] father or for [her] mother in court," M.A. replied, "that would be just horrible if someone would do that." She added, "I would not help either parent if they even asked me to do that. If they set it up – hey can you – I would cut them off right there. I wouldn't lie for either parent just to please them."

Following the questioning, the court found M.A. competent to be a witness:

> And I conclusively make a finding, under our law, she's competent to be a witness. Based on our standards as to whether or not she's incapable of expression, she's extremely capable of expression. She's []capable of being understood; very articulate. That she is []capable of understanding the duty to tell the truth; she's

7

convinced me, the two of you and maybe even your extended family, have raised her to know right from wrong, to tell the truth. And she was very clear on those issues in my view.

So I – I find that the presumption of competency has not been rebutted and that she is not an incompetent person to be a witness. And she is competent.

The court also found M.A. to be truthful.

And by the way if anybody attempted to influence [M.A.]'s testimony, I think they failed. I think [M.A.] is her own person today. I think she convinced me she was going to be truthful. She corrected me a couple of times to make sure I had it right because it was wrong. And I think she was truthful. And I – I don't think – I don't think she wasn't. So if somebody tried to do it, they failed. I don't think she was. I think she was truthful.

The court addressed plaintiff's objection that M.A.'s testifying was not in her best interests.

I think [plaintiff's counsel] was advocating that as a mother you didn't think it was best for her to participate. But I don't believe – well – clearly didn't effectively argue to convince me that she's incompetent, because I ruled the opposite. And in fact she's impressed me more than children even older than her, impressed me as being competent. She – in my view she was extremely competent.

The court then set forth the process for eliciting M.A.'s testimony. The court would consider questions each party proposed and ask some of those

questions as well as its own. The court would then remove M.A. from the hearing, see if the attorneys had further follow-up questions, and ask the questions if appropriate. The court stated that D.L.'s counsel would have the opportunity to cross-examine M.A. The parties agreed that all cameras and microphones would be off except for the court's and M.A.'s.

M.A. testified that she watched her parents arguing. When the court asked her whether either of her parents "suggest[ed] or promise[d] or claim[ed] that they were going to violate any of the [Ten] Commandments," she replied that neither of them did. She stated, "That's not something that they would do. When they're fighting, it's mostly nothing like that." M.A. also testified that, although she did not see either parent touch the other parent because she was in another room, she did not believe that the interactions between her parents became physical.

> [The court]: . . . So during this time when they're having this argument, which you think was about whether or not your sister was going to go with you and your mom to church, did you ever see your mom touch your dad or your dad touch your mom?
>
> [M.A.]: No, because . . . I would have heard the other one yelling at each other about touching either one. So I'm pretty sure no one touched each other during this time.

A-2452-20

The court did not ask whether M.A. heard J.A. directly threaten that he would kill D.L. Plaintiff's counsel requested that the court ask the question and subsequently withdrew the request. The court dismissed M.A. from the stand without allowing plaintiff's counsel to cross-examine her.

At the end of the second hearing, the court entered an order of dismissal of the February 21, 2021 TRO, noting the court "determined that the plaintiff's allegation of domestic violence has not been substantiated." This appeal followed.

Plaintiff first asserts that the trial court erred in bifurcating the hearing on the issue of whether plaintiff could prove by a preponderance of the evidence that defendant committed assault and terroristic acts pursuant to the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to -35. She argues such a "bifurcation" is contrary to the PDVA and established case law and that the court erred in declining to "hear[] any testimony or allow[] the production of evidence regarding the prior history of domestic violence between the parties." We agree and reverse.

The New Jersey Legislature enacted the PDVA "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. "The Legislature attempted to address the problem

10

comprehensively by requiring an immediate response when an offense is suspected, by mandating training for judges as well as court and law enforcement personnel, and by demanding uniformity in the prosecution and adjudication of claims." Cesare v. Cesare, 154 N.J. 394, 399 (1998).

The PDVA, in pertinent part, sets forth the following definitions:

> a. "Domestic violence" means the occurrence of one or more of the following acts inflicted upon a person protected under this act by an adult or an emancipated minor:
>
> . . . .
>
> (2) Assault [N.J.S.A.] 2C:12-1.
>
> (3) Terroristic threats [N.J.S.A.] 2C:12-3.
>
> . . . .
>
> d. "Victim of domestic violence" means a person protected under this act and shall include any person who is [eighteen] years of age or older . . . and who has been subjected to domestic violence by a spouse, former spouse, or any other person who is a present household member or was at any time a household member. "Victim of domestic violence" also includes any person, regardless of age, who has been subjected to domestic violence by a person with whom the victim has a child in common, or with whom the victim anticipates having a child in common, if one of the parties is pregnant. "Victim of domestic violence" also includes any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship.

11

[N.J.S.A. 2C:25-19(a), (d).]

Terroristic threats are defined, in pertinent part, as follows:

a. A person is guilty of a crime of the third degree if he threatens to commit any crime of violence with the purpose to terrorize another. . . .

b. A person is guilty of a crime of the third degree if he threatens to kill another with the purpose to put him in imminent fear of death under circumstances reasonably causing the victim to believe the immediacy of the threat and the likelihood that it will be carried out.

[N.J.S.A. 2C:12-3.]

"A victim may file a complaint alleging the commission of an act of domestic violence. . . .," N.J.S.A. 2C:25-29(a), and seek a TRO on that basis, N.J.S.A. 2C:25-28(f).

The court must engage in a two-prong inquiry in conformance with Silver v. Silver, 387 N.J. Super. 112 (2006), to determine whether to grant an FRO. First, the court must hold a hearing within ten days of the filing of the complaint to determine whether the plaintiff has proved the allegations by a preponderance of the evidence. N.J.S.A. 2C:25-29(a). "[I]n a domestic violence context, a court should regard any past history of abuse by a defendant as part of a plaintiff's individual circumstances and, in turn, factor that history into its reasonable person determination." Cesare, 154 N.J. at 403.

A-2452-20

> [W]hen determining whether a restraining order should be issued based on an act of assault or . . . any of the predicate acts, the court must consider the evidence in light of whether there is a previous history of domestic violence, and whether there exists immediate danger to person or property.
>
> [Silver, 387 N.J. Super. at 126.]

Second, if the plaintiff has met their burden of proof, the court may enter an FRO. N.J.S.A. 2C:25-29(b). "[T]he guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29a(1) to -29a(6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127.

Because D.L. did not object to the "bifurcation" of the trial court's hearing on the predicate offenses, we review the issue under the plain error standard in Rule 2:10-2.

> Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.
>
> [R. 2:10-2.]

"[T]he question of whether plain error occurred depends on whether the error was clearly capable of producing an unjust result. Relief under the plain

error rule, [Rule] 2:10-2, at least in civil cases, is discretionary and 'should be sparingly employed.'" Baker v. Nat'l State Bank, 161 N.J. 220, 225 (1998) (citing Ford v. Reichert, 23 N.J. 429, 435 (1957)).

Here, although the court considered some evidence on the prior history of domestic violence between the parties, the court committed plain error in disallowing additional evidence on domestic violence prior to February 21, 2021. The court must consider "evidence in light of whether there is a previous history of domestic violence." Silver, 387 N.J. Super. 112.

The court allowed plaintiff's testimony that defendant threatened to kill her, that he told her he had two guns, and that he previously threatened her twice with a weapon, through text messages "several times," and altogether "hundreds" of times.

The court, however, explained that it would allow testimony on "prior history if [it] find[s] the plaintiff proved at least one of the two criminal offenses." Because the court found plaintiff did not meet her burden of proof, the court did not permit her to testify on other prior history of domestic violence. Plaintiff asserts that prior history of domestic violence included "many prior incidents," and text messages in which J.A. sent D.L. a picture of a knife and stated, "I will fuck [you] up."

Based on our review, we have concluded disallowing this additional evidence is "clearly capable of producing an unjust result," R. 2:10-2, because a reasonable factfinder could find that defendant made violent threats against plaintiff over the course of their twelve-year relationship, and that such threats, considered together with the February 21, 2021 incident, may now justify an FRO to prevent future abuse. "A history of domestic violence may serve to give content to otherwise ambiguous behavior and support entry of a restraining order." J.D. v. M.D.F., 207 N.J. 458, 483 (2011).

Plaintiff also argues that the court erred in failing to give her an opportunity to cross-examine M.A. We agree that counsel should have had an opportunity to ask questions of M.A., and remand. N.J.R.E. 614.

We reject plaintiff's remaining arguments. Plaintiff argues that the doctrine of parens patriae required the court to prevent harm to M.A. by barring defendant from calling her as a witness in the trial between her parents. Here, the court did not abuse its discretion in permitting defendant to call M.A. as a witness. The court properly conducted an N.J.R.E. 104(a) hearing to determine that M.A. was a competent, truthful witness under N.J.R.E. 601. Further, addressing plaintiff's concern that M.A. would be harmed by testifying, the court carefully minimized any potential trauma by speaking with M.A. alone. Plaintiff

15

offered no additional rationale why testifying would harm M.A. and justify the application of parens patriae over N.J.R.E. 601.

Plaintiff also argues that the court erred in declining to ask M.A. whether she heard defendant directly threaten to kill plaintiff. Because D.L.'s counsel withdrew his request that the court ask this question, we review this issue under the plain error standard pursuant to Rule 2:10-2. The court asked M.A. whether she heard either of her parents "suggest or promise or claim that they were going to violate any of [the Ten] Commandments?" This open-ended, neutral age-appropriate question is not "clearly capable of producing an unjust result," R. 2:10-2, and the court properly exercised its discretion in declining to follow up with the specific question of whether M.A. heard defendant directly threaten to kill plaintiff.

We thus vacate the dismissal of plaintiff's complaint, reinstate the TRO, and remand this matter to the trial court for further proceedings consistent with this opinion. In remanding, we express no view as to what the outcome of the remand should be.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2452-20